**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **PAUL GRAZIANO,** ) | **CASE NO. 1:09CV2661** |
| ) | |
| Plaintiff, ) | **JUDGE LESLEY WELLS** |
| ) | |
| v. ) | |
| ) | **MAGISTRATE JUDGE GREG WHITE** |
| **NESCO SERVICE COMPANY, et al.,** ) | |
| ) | |
| Defendants. ) | **REPORT AND RECOMMENDATION** |

Four motions are before the Court: (1) motion for summary judgment as to all claims by defendant Preferred Benefit Administrators, Inc. ("PBA") (Doc. No. 20); (2) motion to dismiss count three (fraud claim) by defendants Nesco Service Company ("Nesco") and Nesco's President, John Tomsich ("Tomsich") (Doc. No. 36); (3) motion for partial summary judgment as to count six (failure to provide COBRA [Consolidated Omnibus Budget Reconciliation Act] notice) by Nesco and PBA (Doc. No. 37); and, (4) motion to substitute documents attached to the partial summary judgment motion due to a filing/clerical error. (Doc. No. 44.) All motions have been fully briefed.

**I. Procedural Background**

On November 12, 2009, Graziano filed a complaint against Nesco, Tomsich, and PBA raising six claims, as follows: (1) breach of contract, (2) conversion, (3) fraud, (4) breach of fiduciary duty, (5) negligence, and (6) failure to provide notice under COBRA. Counts one through five named "the defendants," referring to all three. Count six named Nesco and/or PBA, as the plan administrator of Nesco's health benefit plan.[1] (Compl., ¶¶ 84-95.)

---

[1] Graziano states in his amended complaint that the health plan administrator must be determined through discovery proceedings as he is unsure whether Nesco or PBA is the

On April 13, 2010, PBA filed a summary judgment motion arguing that all counts should be dismissed as it had no involvement in Graziano's termination and was not the plan administrator. (Doc. No. 20.) On July 13, 2010, Graziano, with the Court's approval, amended his complaint raising the same six counts, but designating that counts one through five proceed against Nesco and Tomsich, and count six against Nesco and/or PBA as the plan administrator. (Doc. No. 33.) On July 27, 2010, Nesco and Tomsich answered and counterclaimed, alleging Graziano breached the non-compete and severance agreements and violated the Ohio Uniform Trade Secrets statute, Ohio Revised Code ("O.R.C.") § 1333.61. (Doc. No. 34.) Simultaneously, Nesco and Tomsich filed a motion to dismiss count three (fraud claim). (Doc. No. 36.) PBA answered on July 27, 2010. (Doc. No. 35.) On July 30, 2010, Nesco and PBA filed a motion for partial summary judgment as to count six. (Doc. No. 37.) Finally, on September 20, 2010, Nesco and PBA, due to administrative error, moved the Court to substitute different versions of exhibits A and B attached to their partial summary judgment motion. (Doc. No. 44.) Graziano filed a brief in opposition to this motion (Doc. No. 45), to which Nesco and PBA replied. (Doc. No. 46.)

## II. Defendants' Motion to Substitute Exhibits

First, the Court addresses the motion for substitution of exhibits. Nesco and PBA state that due to a clerical error, incorrect versions of exhibits A (Doc. No. 37-2) and B (Doc. No. 37-3) were attached to the July 30, 2010, partial summary judgment motion. (Doc. No. 44 at 1.) Defendants contend that the substituted exhibits, which are modified affidavits of Tomsich and Darlene Yankow, an employee from Nesco's Human Resource department, are nearly identical to the original affidavits filed with defendants' partial summary judgment motion and do not change their arguments. (Doc. No. 44 at 4.) Moreover, the defendants contend that the substituted affidavits authenticate other attached exhibits (specifically, P, Q, and R; (Doc. Nos. 37-17; 37-18; 37-19.)) *Id*. Defendants assert that Graziano had every opportunity to argue these exhibits, but raised only the authenticity issue. *Id*. Lastly, defendants contend that granting

---

"COBRA" administrator. (Am. Compl., ¶ 13.)

substitution of exhibits A and B places the partial summary judgment motion before the Court on its merits. Graziano objects to the substitution, stating he would be unfairly prejudiced and noting that the new affidavits contain significant changes. As an example, Graziano maintains that Tomsich's new affidavit declares that Maureen Klimtzak, another employee in Nesco's Human Resource department, drafted a certain payroll deduction letter at Graziano's request, which was not authorized by Tomsich. (Doc. No. 45 at 3.) Notably, the issue of authorization of this letter is not relevant to the dispositive motions currently before the Court. The authenticity of Exhibits P, Q, and R, however, is relevant.

Exhibit P is the coverage summary from CIGNA, a global healthcare service company providing insurance for Nesco and its employees, including Graziano. This exhibit demonstrates that Graziano's medical coverage was cancelled on October 31, 2008. (Doc. No. 37-17, Exh. P.) Yankow authenticates this exhibit and states that CIGNA's coverage summary is a true and accurate copy and that it has been kept in the course of Nesco's regular business activity. (Doc. No. 44-2, Yankow Affid., ¶ 11.) Exhibit Q is a computer screen shot Tomsich received from CIGNA showing that Graziano's insurance was cancelled on October 31, 2008. (Doc. No. 37-18, Exh. Q.) Tomsich's affidavit authenticates this exhibit by explaining CIGNA's relationship and stating the document is also a true and accurate copy kept in the course of Nesco's regular business activity. (Doc. No. 44-1, Tomsich Affid., ¶ 11.) Lastly, Exhibit R is a copy of the Claims Administrator Contract between Nesco and PBA. (Doc. No. 37-19, Exh. R.) Tomsich also authenticates this exhibit. (Doc. No. 44-1, ¶¶ 6-10.)

Graziano had the opportunity to substantially address the substitution issue, but argued only unspecified prejudice, which the Court fails to find. Exhibits P, Q, and R, as authenticated by the amended affidavits of Tomsich and Yankow dated July, 2010, are relevant. In the interest of judicial economy, the Court recommends granting defendants' motion for substitution.[2] (Doc. No. 44.)

---

[2]Defendants noted that they had no objection to allowing Graziano additional time to respond to the supplemental affidavits. (Doc. No. 46 at 2.) Graziano did not, however, request an opportunity to file a supplemental brief.

### III.  Motion to Dismiss Count Three (Fraud Claim)

Defendants Nesco and Tomsich move to dismiss the fraud claim directed against them in the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  In count three of Graziano's amended complaint, he alleges that Nesco and Tomsich made promises they never intended to fulfill in order to induce him to enter into the severance agreement.  (Am. Compl., ¶¶ 49-64.)  Specifically, Graziano's fraud claim alleges that Nesco and Tomsich promised to pay the company's portion and further promised to deduct Graziano's portion of medical insurance premiums from his salary continuation pay checks pursuant to the severance agreement.  (Am. Compl., ¶¶ 51, 53-54.)   Defendants argue that Graziano cannot establish the elements necessary to recover on a fraud claim.  (Doc. No. 36-1 at 5-9.)

**A.  Standard of Review**

As the Court of Appeals for the Sixth Circuit stated in *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545 (6th Cir. 2007):

> The Supreme Court has clarified the law with respect to what a plaintiff must plead in order to survive a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  The Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (citations and quotation marks omitted).  Additionally, the Court emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* (internal citation and quotation marks omitted).  In so holding, the Court disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (recognizing "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"), characterizing that rule as one "best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Twombly*, 127 S.Ct. at 1969.

*Firestone v. CitiMortgage, Inc.*, 2010 WL 2639906, \*\*1 -2  (N.D. Ohio Jun. 29, 2010) (*quoting Ass'n of Cleveland Fire Fighters* at 548).

The Supreme Court gave the following additional guidance in *Ashcroft v. Iqbal*:

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court

4

>should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

– U.S. –, 129 S. Ct. 1937, 1950 (2009).

Federal Rule of Civil Procedure 8 provides the general standard of pleading and only requires that a complaint "contain ... a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S.Ct. at 1949 (citations removed). Rule 8 does not require "detailed factual allegations, but it requires more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (citations and internal quotations omitted).

In contrast to the liberal pleading standard in Rule 8, Federal Rule of Civil Procedure 9 requires a plaintiff to plead "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet the particularity requirement of Rule 9(b), a plaintiff who brings a fraud claim must generally "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Marlar v. BWXT Y-12 L.L.C.*, 525 F.3d 439, 444 (6th Cir. 2008) (*quoting United States ex rel.Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). The complaint must "alert the defendants 'to the precise misconduct with which they are charged'" to protect them "'against spurious charges of immoral and fraudulent behavior.'" *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (*quoting United States ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002)).

In ruling on a motion to dismiss, a court may consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice. *Whittiker v. Deutsche Bank Nat'l Trust Co.*, 605 F.Supp.2d 914, 924-25

5

(N.D. Ohio 2009).

**B. Facts**

In addressing the motion to dismiss count three, the relevant facts taken from the Amended Complaint are as follows: Nesco, an employment-staffing agency (Am. Compl., ¶ 9), hired Graziano in May 2004, as its Division Vice President for the Clerical and Light Industrial employment areas. *Id*. at ¶¶ 16, 17. On August 3, 2004, Tomsich, on behalf of Nesco, and Graziano entered into an employment agreement.[3] *Id*. at ¶ 17. On October 9, 2008, Graziano was terminated due to the economic downturn. *Id*. at ¶¶17, 20. On the same day, Graziano and Tomsich, on behalf of Nesco, signed a severance agreement, noting that Graziano's termination was effective October 10, 2008. *Id*. at ¶ 20. Pursuant to this agreement, Graziano was to be paid $9,615.00 by the end of 2008. (Doc. No. 33-2, Exh. B, Am. Compl.) The agreement also provided that Nesco would pay the employer portion of Graziano's monthly medical premium through December 31, 2008, and Graziano was to remain responsible for the balance. *Id*.

The severance agreement further stated:

> . . . the Company will waive its rights under section 4 of the non-compete

---

[3]The employment agreement entered into between Nesco and Graziano states that Graziano's employment was at-will and then sets forth language as to non-competition, stating that during employment and for one year after termination, Graziano:

> . . . will not in any manner induce, attempt to induce or assist others to induce or attempt to induce:
>
> a) any employee or other person associated with the Company to terminate his or her association with the Company; not in any manner, directly or indirectly, interfere with the business relationship between the Company and any such persons;
> b) any existing client of the company or any prospective client whom the Company has had contact to terminate its business relationship with the Company, or do anything, directly or indirectly to interfere with the business relationship between the Company and any of its clients (including prospective clients), any person or any concerns purchasing from or dealing with the Company.

(Doc. No. 33-1.)

6

> agreement that [Graziano] signed on August 3, 2004. By signing below, you agree that all other provisions of the non-compete agreement will remain enforceable including the confidentiality and the non-solicitation of customers, prospects and employee provisions. Specifically, by signing below you waive and release any and all claims which you may have against the company or its officers, directors, employees or agents arising from and during the term of your employment, including the termination of your employment, whether these claims are known or not yet known to you. You agree not to file any administrative or legal claims against the company, except where a claim is warranted for unemployment benefits. Your signature will also acknowledge that you have been treated in a fair manner during the termination of your employment, that you have no other money due you (whether arising from your labor or from an alleged claim you believe exists), and that you will not disparage Nesco, Inc., affiliates, and officers to other parties; including customers or potential customers.

(Doc. No. 33-2, Exh. B, Am. Compl.)

After Graziano's termination, he joined an online business community known as www.linkedin.com ("LinkedIn") to facilitate finding employment. (Am. Compl., ¶¶ 23, 24.) Subsequently, Graziano sent an online request to become a LinkedIn colleague with some of his former co-workers at Nesco and he also received online requests from employees of Nesco to become a LinkedIn colleague with him. *Id.* at ¶¶ 26, 27. Further, Graziano sent an online request to become a colleague with a friend who worked at Overstock.com. *Id.* at ¶ 28.

Graziano alleges that based on these online requests, Nesco and/or Tomsich sent a letter advising him to "cease all use of the LinkedIn website," as such conduct violated the terms of the severance agreement.[4] *Id* at ¶ 29. Graziano, however, disagreed with Nesco's position and continued his use of LinkedIn. *Id.* at ¶ 30. Graziano further alleges that, as a result, Nesco refused to further perform under the severance agreement, to include paying his salary and medical premiums. *Id* at ¶ 31. Graziano does not indicate the date Nesco rescinded the agreement, but alleges that he is owed $7,212. *Id.* at ¶ 32.

Specifically as to the fraud claim, Graziano alleges that Nesco had committed to maintain his health insurance coverage through December 31, 2008. *Id.* at ¶ 51. Further, on October 20, 2008, the payroll and benefits manager, Maureen Klimtzak, sent him a letter explaining that Nesco would double deduct his portion of the health insurance premium for the last half of

---

[4]This letter is not a part of the record.

October and the first half of November from his first severance paycheck. (Am. Compl., ¶ 53.) The letter further explained that Nesco would triple deduct from his November 5, 2008, check for his health insurance premiums to cover the last half of November and all of December. *Id.* at ¶ 54. Graziano alleges these representations were false and, that, as a result, he was fraudulently induced to sign the severance agreement. *Id.* at ¶ 57.

### C. Analysis

In order to state a claim for fraud, a plaintiff must allege: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying on it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Found. for Moral Law, Inc. v. Infocision Mgmt. Corp.*, 2008 WL 5725627, *5 (N.D. Ohio May 27, 2008) (*citing Groob v. KeyBank*, 108 Ohio St.3d 348, 357, 843 N.E.2d 1170 (2006)) *(citing Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987)).

Moreover, if a fraud claim is a recapitulation of a breach-of-contract claim, seeking recovery of the same economic loss contemplated by the contract, such claim is not allowed under Ohio law. *See Gator Dev. Corp. v. VHH, Ltd.,* 2009 WL 1027584, *4 (Ohio App. 1st Dist., Apr. 17, 2009).

In Graziano's opposition brief, he contends that the defendants concealed the fact that he would only receive medical coverage contingent upon the continuation of the severance agreement. (Doc. No. 39 at 7.) This argument, however, differs from the fraud claim set forth in his amended complaint. The amended complaint states as follows:

> ¶51. On October 9, 2008, Defendant John Tomsich stated that the company (Nesco Resource) would pay its portion of the monthly medical premiums through December 31, 2008.
>
> ¶52. Plaintiff chose to continue health benefits in reliance upon the statements made by the defendants.
>
> ¶53. On October 20, 2008, Maureen Klimtzak sent a letter to Mr. Graziano explaining the payroll deductions. For the October 20, 2008 payroll, Nesco

8

> doubled deducted for the health insurances to pay for the last half of October and the first half of November.
>
> ¶54.  On the check dated 11/5/08, Nesco was to triple deduct the insurance premiums to pay for the last half of November and both halves of December.
>
> ¶55.  These deductions were never made and as a result, Plaintiff's insurance coverage was cancelled.

(Doc. No. 33 at 7-8.)  Graziano's amended complaint states that defendants made these "representations and/or omissions," knowing they were false and with the intent to fraudulently induce him to sign the severance agreement.  (Doc. No. 33 at 8, ¶¶ 57-59.)  He further alleges that he justifiably relied on such representations, suffering substantial damages when his children required emergency medical care.  *Id.* at ¶¶ 56, 60-61.

In Graziano's brief, however, he appears to base his fraud claim upon the manner in which the medical premiums were to be paid.  He states: "The fraudulent scheme was for the defendant Nesco to retain control over the medical coverage through its control of the manner of the employee premium payments, which the defendants failed to disclose could only be paid through deductions from the payroll check."  (Doc. No. 39 at 7.)  He further contends that the defendants fraudulently withheld information that the premiums could only be paid through deductions from the payroll check.  *Id.*  Graziano explains that Nesco and Tomsich led him to believe that he would have medical coverage through the end of 2008 as long as he paid the employee premium.  *Id.*  Graziano avers that this fraudulent scheme allowed Nesco to avoid payment of medical premiums.  *Id.*

Defendants counter that the only issue is whether Graziano was fraudulently induced into signing the severance agreement.  (Doc. No. 42 at 2.)

The severance agreement provides:

> . . . the company will pay its portion of the monthly medical premium through December 31, 2008.  You will still be responsible for the employee portion of the monthly premium.  If you choose not to pay your portion, your company benefits will be terminated at month's end. . . .  By signing below, you agree that all other provisions of the non-compete agreement will remain enforceable including the confidentiality and the non-solicitation of customers, prospects, and employee provisions.

(Am. Compl, Exh. B.)  The severance agreement does not provide how Graziano's portion of his

medical premiums were to be paid.  Eleven days after the severance agreement was signed, Graziano and Ms. Klimtzak set up a plan whereby his medical premiums would be deducted from his salary continuation payments.  (Am. Compl, ¶ 53.)  Graziano has failed to demonstrate that Nesco and Tomsich made any fraudulent representations or that they never intended to continue medical coverage for him as provided in the severance agreement.  In fact, the Klimtzak letter establishing a payment schedule, and the Nesco letter requesting Graziano to stop some of his use of the LinkedIn network claiming it violated the terms of the severance and non-compete agreements, seem to establish otherwise.  (Doc. No 33, Am. Compl, ¶¶ 30, 31.)  The fraud claim, therefore, lacks plausibility.

Moreover, Graziano seeks identical damages in his fraud claim as he does in his breach of contract claim.  (Doc. No. 33 at 14-15.)  As the fraud claim is merely a recapitulation of his contract claim, it is not allowed under Ohio law.  *See Gator Dev. Corp.*, 2009 WL 1027584 at *4.

The Court, therefore, recommends granting Nesco and Tomsich's motion to dismiss the fraud claim.

### IV.  Motion for Partial Summary Judgment

COBRA imposes a statutory requirement that a plan administrator notify "any qualified beneficiary" of his right to continue health insurance coverage for up to eighteen months after a "qualifying event." *See* 29 U.S.C. § 1166(a)(4) (notice requirement); 29 U.S.C. § 1162 (continuation coverage); 29 U.S.C. § 1163(2) (termination of covered employee as qualifying event).  "Providing appropriate notice is a key requirement under COBRA.... If the administrator fails to provide that notice [of COBRA rights] to the qualified beneficiary, it may be bound to provide coverage to [him]."  *McDowell v. Krawchison,* 125 F.3d 954, 957 (6th Cir. 1997); *Lincoln Gen. Hosp. v. Blue Cross/Blue Shield*, 963 F.2d 1136, 1139 (8th Cir. 1992).

In count six, Graziano claims that the defendants failed to notify him of his rights to continuing health insurance coverage under COBRA within fourteen days of his "qualifying event."  (Am. Compl., ¶ 98.)  He further claims that the qualifying event occurred on either January 1, 2009, as provided for in the severance agreement, or approximately November 15,

2008, the date through which he paid the employee portion of health benefits, as well as the date he claims his coverage was actually lost. *Id.* at ¶¶ 92, 93. Lastly, Graziano contends that summary judgment should be denied as to PBA as the identity of the plan administrator remains in question. *Id.* at ¶ 13.

Defendants assert that Nesco, as the plan administrator, fully complied with COBRA notice requirements. (Doc. No. 37-1 at 14-17.) Defendants further assert that PBA was never the plan sponsor or administrator, and, consequently, had no duty to Graziano under COBRA. *Id.* at 19-22.

### A. Standard of Review

Federal Rule of Civil Procedure 56(c)(2) governs summary judgment motions and states:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is

some metaphysical doubt as to material facts. *Id.* "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Liberty Lobby*, 477 U.S. at 257.

Courts are given wide latitude in considering any document of record in its analysis of a summary judgment motion, regardless of when the document was filed and for what purpose. For example, an affidavit that is on file, regardless of the purpose for which it was prepared, can be considered by the court in deciding a motion for summary judgment. *See Carmona v. Toledo*, 215 F.3d 124, 132 n. 7 (1st Cir. 2000); *McLaughlin v. Liu*, 849 F.2d 1205, 1206 n. 3 (9th Cir. 1988); *McCullough Tool Co. v. Well Surveys, Inc.*, 395 F.2d 230, 236 n. 7 (10th Cir. 1968); 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure § 2722, at 378 (3d ed. 1998).

### B. Facts Pertaining to the COBRA Notice

As an employee, Graziano was covered under Nesco's self-insured employee health benefit plan (the "Plan.") (Doc. No. 37-1 at 7; Tomsich Affid., ¶ 5; Yankow Affid., ¶ 8.) The Plan names Nesco as both the plan sponsor and plan administrator.[5]

> The name, address, ZIP code and business telephone number of the sponsor of the Plan is:
>
> NESCO Service
> 6140 Parkland Road
> Cleveland, Ohio 44124
> 216-461-6000
>
> * * *
>
> The name, address, ZIP code and business telephone number of the Plan

---

[5]Graziano attempts to dispute the fact that Nesco is both the plan sponsor and administrator by relying on a letter written by PBA's President, Lisa Brower, as well as her affidavit, that PBA claimed to be the plan administrator. (Doc. No. 43 at 3-4.) Upon the Court's review of these documents, however, it is clear that PBA specifically denies being the plan administrator or sponsor. (Doc. Nos. 20-12; 37-12; 37-16, ¶ 2.) Brower's affidavit further states that PBA contracted with Nesco to send out COBRA notices, receive premium payments for continuing coverage, and attend to other administrative functions, as the claims administrator. (Doc. No. 37-16, ¶ 2.)

12

> Administrator is:
>
> Employer named above.

(Doc. No. 37-14 at 97; Tomsich Aff. ¶ 5; Yankow Aff. ¶ 8.)

On February 14, 2006, Graziano participated in Nesco's open enrollment for medical benefits, specifying his mailing address was 4118 Logan's Way, Perry, Ohio 44081 ("the Logan's Way address").[6] (Yankow Affid., ¶ 8; Doc. No. 37-8.) On April 4, 2008, Graziano acknowledged receiving Nesco's Employee Handbook[7], which expressly provided for continuation of health benefits pursuant to COBRA should an employee lose coverage due to separation from employment.[8] (Doc. No. 37-1 at 8; Yankow Affid., ¶ 6; Doc. No. 37-7 at 20.) The severance agreement also refers to the COBRA notice, stating:

> . . . the company will pay its portion of the monthly medical premium through December 31, 2008. You will still be responsible for the employee portion of the monthly premium. If you choose not to pay your portion, your company benefits will be terminated at month end. You may elect to continue health benefits starting January 1, 2009 under COBRA.

(Am Compl., Exh. B., Doc. No. 33-2.) It further states that Graziano's termination date was effective October 10, 2008.[9] *Id.*

Nesco submits evidence from CIGNA, the health care provider, demonstrating that

---

[6] On August 6, 2008, two months before Graziano's separation of employment, he changed his benefits election to add a son. (Yankow Aff. ¶ 9; Doc. No. 37-9.) Defendants point out that Graziano did not include a new address.

[7] When hired in 2004, Graziano first acknowledged receiving an employee handbook which stated that an employee would be allowed to receive continuing health care coverage under COBRA. (Doc. No. 37-1 at 8; Yankow Aff. ¶ 5.)

[8] The Employee Handbook also directed employees that "[t]he accuracy of your personnel file is your responsibility. Please report promptly to your manager/supervisor of changes in the following: Address and telephone number; Marital status; Legal change of last name; Beneficiary listed in your insurance policy," among others. (Yankow Aff. ¶ 7; Doc. No. 37-7 at 13.)

[9] Upon termination of employment, Graziano was to receive his continuing salary payments on October 20, 2008, November 5, 2008, and November 19, 2008. (Doc. No. 37-15, Klimtzak Letter).

13

Graziano's health benefits were cancelled on October 31, 2008. (Doc. Nos. 37-17, Exh. P; 37-18, Exh. Q.) These documents were authenticated by Yankow and Tomsich as being true and accurate copies kept in the course of Nesco's regular business activity. (Doc. Nos. 44-2, Yankow Affid., ¶ 11; 44-1, Tomsich Affid., ¶ 11.)

On October 31, 2008, Nesco informed Jasmine Juarez, an Eligibility Specialist for PBA, that Graziano was separated from employment and that his loss of coverage was effective that date. (Doc. No. 37-13, Juarez Affid., ¶ 5.) On November 4, 2008, PBA sent a COBRA Continuation Coverage Election Form to Graziano at the Logans Way address via U.S. mail. (Doc. No. 37-10, Exh. I.; Doc. No. 37-13, Juarez Decl., ¶ 6.) A second notice, in compliance with the American Recovery and Reinvestment Act of 2009 ("ARRA"), was also sent to the same address on April 14, 2009, via U.S. mail. (Doc. No. 37-11, Exh. J.) Both Juarez and Yankow authenticated these exhibits as true and accurate copies kept in the course of regularly conducted activity of their employers. (Doc. No. 43-2, Yankow Affid., ¶¶ 13, 14; Doc. No. 37-13, Juarez Decl., ¶¶ 6, 7.)

Graziano states in the amended complaint that in early December 2008, after taking his children for emergency care, he first learned that his health benefits were cancelled for lack of payment. (Am. Compl., ¶ 56.) By sworn affidavit, he later states that January 9, 2009, was the date he took his son for medical care and learned his insurance was cancelled. (Doc. No. 43-1, Graziano Affid., ¶¶ 19-20.)

### C. Analysis

#### 1. Plan Administrator

Pursuant to 29 U.S.C. § 1132(c), the plan administrator is liable to plan participants or beneficiaries for failing to provide COBRA notice under 29 U.S.C. § 1166(a)(4) ("Notice Requirements").

Here, the Plan clearly sets forth that Nesco is both the plan sponsor and plan administrator. Moreover, the contract between Nesco and PBA expressly provides that "[i]n no event shall the Claims Administrator [PBA] be the Plan Administrator for purposes of the Plan." (Doc. No. 37-19 at 6.) The Court, therefore, finds that Nesco is the plan administrator and,

14

consequently, the responsible party under COBRA.

### 2. Qualifying Event

Under COBRA, a plan sponsor of a group health plan "shall provide ... that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan." 29 U.S.C. § 1161(a). The termination of an employee, for any reason other than the employee's own gross misconduct, constitutes a "qualifying event." 29 U.S.C. § 1163(2).

The parties dispute the date of the "qualifying event." Defendants contend that pursuant to the severance agreement, Graziano's termination date is the qualifying event, and, further, that under the terms of the Plan, the loss of coverage date is October 31, 2008, the date Graziano would have, absent the severance agreement, lost medical benefits as a result of his termination. (Doc. No. 37-1 at 8; Yankow Aff. ¶ 10; Doc. No. 37-14 at 93 "your insurance will cease on . . . the last day of the calendar month in which your Active Service ends. . . .") Graziano, relying on the severance agreement, argues that the "qualifying date" was January 1, 2009, as that is the date the agreement provides he could elect to continue health benefits under COBRA. (Am. Compl., Doc. No. 33-2.) Graziano also contends that the date of the qualifying event could have been as early as November 15, 2008 (the date he claims his medical coverage was actually lost). *Id.* at ¶ 99.

Defendants, relying on *Ashcraft v. Shenango Furnace Co.*, 56 F.Supp.2d 895, 904 (N.D. Ohio 1999), argue that the date coverage is actually lost is not a qualifying event. (Doc. No. 37-1 at 10.) Graziano also relies on *Ashcraft* and similar cases arguing that a "termination of employment . . . is only a qualifying event if it results in loss of coverage." (Doc. No. 43 at 7.) In *Ashcraft*, the plaintiff, upon retirement, never lost medical coverage; therefore, no qualifying event occurred to trigger his COBRA rights. *Ashcraft* at 904. Graziano's case, however, is distinguishable as his medical coverage was cancelled on October 31, 2008, after it was alleged he breached the severance agreement.

Graziano also relies on portions of IRS Bulletin 2009-16, Notice 2009-27 to support his argument that the loss of coverage date is applicable. This bulletin addresses when a person

15

becomes an "assistance eligible individual" under the ARRA. The Bulletin explains that "Section 3001 of ARRA provides for a 65 percent reduction in the premium otherwise payable by certain involuntarily terminated individuals . . . who elect COBRA continuation health coverage . . . ."[10] IRS Notice 2009-27.

Nesco and PBA respond that Graziano's eligibility under ARRA is not the issue here. (Doc. No. 48 at 11.) They point out that the Bulletin also sets forth that "the loss of coverage will be considered to have occurred as of the date for which the employer begins making the provision of such COBRA continuation coverage." *Id.* They argue that even if this provision is applicable to COBRA notices, Graziano's health benefits were cut-off on October 31, 2008, which would be the loss of coverage date. *Id.* at 11-13. To clarify their position, defendants rely on an example set forth in the IRS code of federal regulations:

> Example 1. (i) An employee who is covered by a group health plan terminates employment (other than by reason of the employee's gross misconduct) and, beginning with the day after the last day of employment, is given 3 months of employer-paid coverage under the same terms and conditions as before that date. At the end of the three months, the coverage terminates.
>
> (ii) The loss of coverage at the end of the three months results from the termination of employment and, thus, the termination of employment is a qualifying event.

26 C.F.R. § 54.4980B-4(g).

This case presents some rather unique facts. Graziano's employment was terminated effective October 10, 2008. (Am. Compl., ¶ 20.) Absent the severance agreement, his health benefits would have ended October 31, 2008, unless he elected to continue them under COBRA. The severance agreement provided, however, that Graziano could continue his regular coverage

---

[10]Plaintiff relies specifically on one portion of the bulletin that states:

If the employer treats . . . health coverage as deferring the loss of coverage then for purposes of the ARRA premium reduction the loss of coverage (an eligibility for Federal COBRA) will be considered to occur when the employer's provision of health coverage on the same terms as for similarly situated active employee ends.

*Id.*

16

through December 31, 2008, and elect COBRA coverage thereafter. Pursuant to that agreement, Graziano's portion of the coverage premium for the second half of October and the first half of November was deducted from his initial severance check. This deduction is the basis for Graziano's claim that his coverage was not actually terminated until November 14, 2008. There is no dispute, however, that sometime in October, 2008, Nesco claimed the severance agreement was breached by Graziano's LinkedIn activities. Graziano acknowledges that on October 24, 2008, Nesco's attorney informed him "that Nesco would breach the severance agreement." (Doc. No. 43 at 5; Graziano's Affid., Doc. No. 50-1, ¶ 16.) The Court takes this to mean that Graziano was informed that Nesco did not intend to honor the agreement. Consequently, each party now maintains the other breached the severance agreement. Which party actually breached the severance agreement is not at issue here.

There is also no doubt that Graziano's coverage, whether rightly or wrongly, was terminated on October 31, 2008, notwithstanding his contribution towards premiums through mid-November. Graziano has not demonstrated how either January 1, 2009, or November 14, 2008, are "qualifying event" dates. Applying 29 U.S.C. § 1163(2), the Court finds that the qualifying event date is either October 10, 2008, the date Graziano's termination was effective, or October 31, 2008, the date his coverage was actually terminated. The question remains, however, whether a COBRA notice was timely sent.

### 3. COBRA Notice

COBRA requires a plan administrator after a qualifying event to notify "any qualified beneficiary" of his right to continue health insurance coverage for up to eighteen months. *See* 29 U.S.C. § 1166(a)(4) (notice requirement); 29 U.S.C. § 1162 (continuation coverage). An employer must notify a benefit plan administrator of a qualifying event triggering COBRA coverage within 30 days of its occurrence. 29 U.S.C. § 1166(a)(2). In turn, the plan administrator must inform the covered employee of his rights under COBRA. 29 U.S.C. § 1166(a)(4).

Nesco and PBA contend that they complied with COBRA's notification requirements by mailing notice to Graziano on November 4, 2008, via regular U.S. Mail at the Logan's Way

17

address. (Doc. No. 37-1 at 17.) Graziano responds that since his loss of coverage, according to the severance agreement, did not occur until January 1, 2009, defendants have not demonstrated that notice was made after that date and, therefore, summary judgment should be denied. (Doc. No. 43 at 10.)

"Providing appropriate notice is a key requirement under COBRA.... If the administrator fails to provide that notice [of the triggering of COBRA rights] to the qualified beneficiary, it may be bound to provide coverage to her." *McDowell v. Krawchison*, 125 F.3d 954, 957 (6th Cir. 1997) (*citing Lincoln Gen. Hosp. v. Blue Cross/Blue Shield*, 963 F.2d 1136, 1139 (8th Cir. 1992)). The parties do not dispute that COBRA notice was required within 44 days of the qualifying event. *See* 29 C.F.R. § 2590.606-4.

It is a long established presumption that a letter properly addressed, stamped, and mailed was received by the individual to whom the letter was addressed. *Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932); *Hoffenberg v. Comm'r of Internal Revenue*, 905 F.2d 665, 666 (2d Cir. 1990); *Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir. 1989); *Phillips v. Riverside*, *Inc.*, 796 F.Supp. 403, 407 (E.D. Ark., 1992); *Truesdale v. Pacific Holding Co.*, 778 F.Supp. 77, 81 (D.D.C. 1991). Mere denial of receipt is insufficient to rebut the presumption. *Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir. 1985). However, "testimony of non-receipt standing alone, would be sufficient to support a finding of non-receipt...." *Riverside*, 796 F.Supp. at 408 (*quoting In re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985)).

The Court has determined that the qualifying event was either Graziano's termination date, October 10, 2008, or the last date of actual coverage, October 31, 2008. The evidence shows a COBRA notice was sent by PBA on November 4, 2008, via regular U.S. Mail to the Logan's Way address. (Doc. No. 37-10; Doc. No. 37-3, Yankow Aff., ¶ 13; Doc. No. 37-13, Juarez Decl., ¶¶ 5-6.) Lisa Brower, President of PBA, also indicated that the November 4, 2008, notice was not returned as undeliverable by the U.S. postal service. (Doc. No. 43-5 at 2.) More importantly, Graziano has not denied receiving the November 4, 2008, notice. In his affidavit, Graziano claims he did not receive a COBRA notice after January 1, 2009. (Doc. No. 50-1,

18

Graziano Affid., ¶ 22.)

Notice was sent twenty-five days after October 10, 2008, and four days after actual loss of coverage. Courts have specifically found that employers comply with the statute when they send the notices via first class mail to the employee's last known address. *See Olvera v. Sierra Nevada College*, 2010 WL 185950, *6 (D. Nev. Jan. 15, 2010); *Torres-Negron v. Merck & Co.*, 488 F.3d 34, 45 (1st Cir. 2007) (citing cases). The Court, therefore, finds that Graziano received timely COBRA notice.

## V. PBA's Motion for Summary Judgment

On April 13, 2010, prior to the filing of the Amended Complaint, defendant PBA filed a summary judgment motion requesting the Court to dismiss all claims. (Doc. No. 20 at 2.) It argued that counts one through five did not implicate PBA as they relate to the severance agreement. *Id*. Graziano's amended complaint does not name PBA in counts one through five. Moreover, as PBA joined with Nesco in filing the motion for partial summary judgment on count six, the Court recommends that PBA's April 13, 2010, motion for summary judgment be denied as moot. (Doc. No. 20.)

## VI. Conclusion

The Court recommends granting defendants' motion to substitute exhibits. (Doc. No. 44.) Specifically, it is recommended that Doc. Nos. 44-1 and 44-2 be substituted for Doc. Nos. 37-2 and 37-3.

The Court further recommends that the (1) motion to dismiss the fraud claim (count three) by Nesco and Tomsich be granted (Doc. No. 36); (2) motion for partial summary judgment on the failure to provide COBRA notice (count six) by Nesco and PBA be granted (Doc. No. 37); and, (3) motion for summary judgment as to all counts against PBA be found moot. (Doc. No. 20.)

                                               s/ Greg White
                                               United States Magistrate Judge

Date: March 4, 2011

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.** *See* **28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**